# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39563**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Brandon M. LEACH**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 8 July 2020

———————————

*Military Judge:* Christina M. Jimenez.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, reduction to E-1, and a reprimand. Sentence adjudged 8 June 2018 by GCM convened at Hill Air Force Base, Utah.

*For Appellant:* Major David A. Schiavone, USAF; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Michael T. Bunnell, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge POSCH joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault, in violation of Ar-

ticle 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. Appellant was also found guilty, consistent with his pleas made pursuant to a pretrial agreement (PTA), of one specification each of wrongful use of marijuana on divers occasions and wrongful use of anabolic steroids on divers occasions, in violation of Article 112a, UCMJ, 10 U.S.C. § 112a.[1,2] Appellant was sentenced to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority disapproved the forfeitures, but otherwise approved the sentence as adjudged.

On appeal, Appellant raises nine issues: (1) whether the court-martial lacked subject matter jurisdiction over Appellant; (2) whether the evidence was legally and factually sufficient to support Appellant's sexual assault conviction; (3) whether the military judge erred in admitting prior out-of-court statements made by the victim and failing to instruct the members on the proper use of the information contained in those statements; (4) whether the military judge erroneously instructed the members on consent; (5) whether trial counsel committed prosecutorial misconduct during closing argument; (6) whether the trial counsel failed to disclose information to the Defense and the military judge erred by not dismissing the case or ordering a new trial;[3] (7) whether trial defense counsel were ineffective; (8) whether there were significant errors in Appellant's case such that their cumulative effect impaired the fairness of his trial; and (9) whether the permissive inference of lack of consent in a sexual assault prosecution is constitutional. Based upon our resolution of the first seven issues, we resolve the eighth issue adversely to Appellant. We have recently rejected similar arguments raised by Appellant in his ninth assignment of error, and we rely on our rationale in those cases in rejecting Appellant's argument here. *See United States v. Plourde*, No. ACM

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] One specification of wrongful importation of anabolic steroids was withdrawn pursuant to the PTA.

[3] Appellant framed these fifth and sixth issues as: "Did the trial counsel engage in prosecutorial misconduct during closing argument and rebuttal and for failing to disclose notes of LE's statements during her interview with trial counsel?" and "Did the military judge err in failing to *sua sponte* interrupt trial counsel's improper closing argument and/or ruling against Appellant in the post-trial Article 39(a), UCMJ, [10 U.S.C. § 839(a),] session regarding the Government's failure to provide *Brady* material in a timely fashion in response to specific discovery requests for statements by LE?" *United States v. Brady*, 373 U.S. 83 (1963).

39478, 2019 CCA LEXIS 488, at *31–36 (A.F. Ct. Crim. App. 6 Dec. 2019) (unpub. op.), *rev. denied*, 2020 CAAF LEXIS 106 (C.A.A.F. 27 Feb. 2020); *United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *26–32 (A.F. Ct. Crim. App. 30 Sep. 2019) (unpub. op.), *rev. denied*, 2020 CAAF LEXIS 124 (C.A.A.F. 4 Mar. 2020). Although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay. We find no error that materially prejudiced a substantial right of Appellant and affirm the findings and sentence.

## I. BACKGROUND

In May 2016, when he arrived at his first permanent duty station about nine months after enlisting in the Air Force, Appellant met LE, a civilian woman who lived nearby. Around the same time, LE joined the Air Force Reserve under the delayed enlistment program. The two began dating, and by the fall of 2016, LE moved into Appellant's apartment. Appellant also began using anabolic steroids which he would purchase from overseas vendors. He would either inject liquid steroids into his body with needles or ingest them orally. LE assisted Appellant on some occasions by accompanying him on trips to purchase money orders to pay for the steroids, picking up steroids on his behalf when the packages arrived, and disposing of the steroids' packaging. LE also helped Appellant in the administration of the steroids by periodically preparing needles for him and injecting him with the steroids.

When LE left for basic military training in January 2017, Appellant told her he wanted to take a break from their relationship. About five weeks later, the couple reconciled during a telephone call. A few weeks after that, however, as LE was traveling from basic training to her technical training school, Appellant called and confessed that he had cheated on LE, contracting chlamydia in the process. Appellant apologized, and LE forgave him a few days later.

During this time, Appellant began developing a closer relationship with one civilian woman in particular, BL.[4] BL—whom Appellant described as a habitual marijuana user and fellow steroid user—stored marijuana, a grinder, and a pipe at Appellant's house, which Appellant both knew about and agreed to.

---

[4] At the time, BL's initials were BB; however, she later married Appellant prior to his court-martial. We refer to her as BL in this opinion.

LE returned from technical training in early May 2017 and moved back in with Appellant. Around three days later, LE found the marijuana, grinder, and pipe in their apartment. She confronted Appellant about it and told him to get the marijuana out of the house, but he refused.

Interested in "explor[ing his] feelings" for BL, Appellant "sent [LE] away" for a couple days around 4 July 2017, "because [he] did not want [LE] to be around the drug smoke, seeing as she was a reservist in the Air Force." Appellant told LE he intended to smoke the marijuana in the apartment with an unnamed red-headed female coworker of his. While LE was out of the apartment, BL—who had short red hair—came over, smoked marijuana with Appellant, and spent the night. The following day, Appellant sent LE text messages saying he was tired of LE not coming onto him, that she "[wasn't] trying hard enough," that he wanted to take a break from the relationship, that LE needed to move out of the apartment, and that he would call the police if she did not leave.

After moving her possessions out of the apartment, LE reached out on 7 July 2017 to talk to a chaplain about the relationship. The chaplain's advice was that she take a week and think about the situation, which LE did. The next week, LE decided to report Appellant's drug use to the authorities, and on 14 July 2017, she told Security Forces investigators about his marijuana and steroid use. During the interview, the investigators asked if Appellant had physically assaulted LE. In response, she disclosed that Appellant had sexually assaulted her in late May 2017. Because Security Forces does not have the authority to investigate sexual assault allegations, LE's case was referred to the Air Force Office of Special Investigations (AFOSI) for investigation, and LE was interviewed by those agents the following week on 21 July 2017. Both interviews were recorded.

Based upon the information provided by LE and the interception of a shipment of steroids to Appellant, Appellant's apartment was searched by law enforcement in September 2017, resulting in the seizure of numerous pills, vials, and bottles of liquid steroids, along with more than 100 syringes. Agents conducting the search also found and seized the marijuana and related paraphernalia LE had described.

Charges accusing Appellant of using and importing steroids, using marijuana, and sexually assaulting LE were preferred in January 2018 and referred to a general court-martial in April 2018. Despite the earlier search of his apartment and the pendency of his court-martial, Appellant continued to procure and use steroids, contributing to him being placed in pretrial confinement in late April 2018 after a search of his new apartment found more bottles of liquid steroids and another batch of more than 100 syringes.

## II. DISCUSSION

### A. Subject-matter Jurisdiction

Appellant was charged with violating Article 120, UCMJ, by causing bodily harm to LE. He argues on appeal that the Government pursued a theory at trial of Appellant using "unlawful force" and either threatening LE or placing her in fear, which Appellant asserts was a different offense than the one he was charged with. Appellant then posits that a court-martial only has subject-matter jurisdiction over charges referred to it and lacks jurisdiction over alternate charging theories not included in the referred charges. Thus, Appellant argues the court-martial lacked jurisdiction over an "unlawful force" theory of proving the charged offense of sexual assault. Building from that premise, Appellant asserts he was therefore confused as to which theory of liability he had to defend against, the members may also have been confused, and this court cannot be sure on what theory Appellant was convicted.

We review questions of jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). Even when not raised at trial, jurisdictional challenges may be raised for the first time on appeal. *See* Rule for Courts-Martial (R.C.M.) 907(b)(1); *United States v. Reid*, 46 M.J. 236, 240 (C.A.A.F. 1997).

General courts-martial have jurisdiction to try military members subject to the UCMJ for any offense punishable under the UCMJ. Article 18, UCMJ, 10 U.S.C. § 818. Contrary to Appellant's argument, subject-matter jurisdiction within the military justice system depends "solely on whether the accused 'was a member of the armed services at the time of the offense charged.'" *United States v. Jordan*, 29 M.J. 177, 184–85 (C.M.A. 1989) (quoting *Solorio v. United States*, 483 U.S. 435, 451 (1987)), *vacated on other grounds*, 498 U.S. 1009 (1990). The accused's status "is the focus for determining both jurisdiction over the offense and jurisdiction over the person." *United States v. Ali*, 71 M.J. 256, 264 (C.A.A.F. 2012) (citations omitted).

Appellant does not argue he was not a member of the military at the time of the alleged sexual assault. Nor does Appellant contest that he was charged with sexually assaulting LE in violation of Article 120, UCMJ. Instead, Appellant alleges the Government sought to prove the offense under a different theory of commission than the theory set out in the referred charge. Alternatively, Appellant argues the Government claimed Appellant used "unlawful force," thereby trying to prove Appellant raped LE, an offense which sexual assault committed by causing bodily harm is a lesser-included offense of. Such an allegation may raise issues with respect to certain aspects of Appellant's court-martial, but subject-matter jurisdiction is not one of them.

### B. Legal and Factual Sufficiency

Appellant argues the evidence is legally and factually insufficient to support his conviction for sexually assaulting LE. Appellant's argument regarding legal sufficiency is that the Government pursued a conviction on "uncharged theories of criminal liability" which deprived Appellant of fair notice. Appellant was charged with sexually assaulting LE by causing bodily harm to her, but he contends the Government pursued theories of "unlawful force" and threatening LE or placing her in fear.

From a factual sufficiency standpoint, Appellant's argument is essentially that LE is not a credible witness based upon her motive to fabricate, assertions she had made false statements, and differences between her in-court testimony and the statements she made in her interviews with law enforcement about the assault. We are not convinced Appellant's conviction is either legally or factually insufficient.

#### 1. Additional Background

In order to provide context for trial defense counsel's attacks on LE's credibility, as well as to provide details relevant to Appellant's other claims of error discussed below, we incorporate information in this section which was not presented to the members; however, we only consider evidence admitted at trial in assessing legal and factual sufficiency.

#### *a. LE's Security Forces Interview*

LE first disclosed that she had been sexually assaulted by Appellant during her 14 July 2017 interview with Security Forces investigators. The interview, which lasted approximately 20 minutes, initially focused on Appellant's steroid and marijuana use. Only the portion of the interview pertaining to Appellant sexually assaulting LE was admitted at trial as Prosecution Exhibit 2. This portion of the interview, which lasted about one minute and ten seconds, consisted of the following exchange between LE and the investigator who interviewed her, Technical Sergeant (TSgt JG):

> Q. Has he physically assaulted you in any other way?
>
> A. One night we were having a fight and I went to bed, and he came in and he wanted to have sex. I didn't want it, though.
>
> Q. Did you tell him no?
>
> A. No. I—I tried to get my legs closed (inaudible).
>
> Q. Okay. (Inaudible) So—so you verbally—you told him, "No, I don't want to do this?"
>
> A. Well, I was already asleep and then he came in.

Q. Okay. So he—so you were actually asleep—

A. Yes.

Q. —and then he came into the room. Did he wake you up or were you partially awake, kind of—

A. I was partially awake.

Q. Okay. And what did—he just said, "I want to have sex," or he just started?

A. He just started.

Q. Okay. And you verbally told him no?

A. (Inaudible)

Q. Do you remember exactly what you said?

A. (Inaudible) don't want to do this. (Inaudible).

Q. Okay. And so he forced himself on you?

A. Yes.

Q. Okay. Did he—I know it's going to be uncomfortable, but did he put his penis inside you?

A. Yes.

### b. LE's AFOSI Interview

After the Security Forces interview was terminated, LE's sexual assault allegation was transferred to AFOSI for investigation, and LE was interviewed by those agents one week later. This interview lasted over an hour and a half. Prosecution Exhibit 3 consisted of a 20-minute segment of the interview relating to LE's sexual assault allegation. In this segment of the interview, an agent asked LE to tell him about the day of the assault. LE explained that she and Appellant had been fighting: "We weren't—we weren't talking. We were just yelling at each other." That night, LE went to bed and had fallen asleep by the time Appellant came into the room. She said, "[H]e came in, got underneath the covers and started to pull my shorts and underwear down. And by that time I was—I could feel what was going on. I was half awake by then. I said, 'No, I don't want this. It's not right.' I tried to keep my legs closed, but he just kept going until he got what he wanted."

Once LE gave the above synopsis, the agent began asking follow-up questions and LE provided additional detail. LE said Appellant had been wearing basketball shorts and a tank top, and she thought she heard Appellant take his "pants" off before he got into bed. She said Appellant was trying to penetrate her vagina from behind while she was on her side, but then had her flip

7

over so that she was laying on the bed face-down on her stomach. LE continued, "He put his—I don't know what to say, but yeah, he put it in my vagina and he just kept going until he finished inside me." The agent asked, "And so you were on your stomach?" LE replied, "Yeah." She said Appellant had one hand on her shoulder and one "around [her] hip," making LE feel "trapped, like [she] couldn't go anywhere." She described the penetration as "forced" and that it "hurt a lot." The agent asked LE to put the pain on a scale of one to ten, where one was "doesn't hurt" and ten was "excruciating . . . like [you're] going to pass out," and LE said, "maybe like five and a half or six." LE said she did not say anything other than, "No, I don't want this. This isn't right." When asked if Appellant said anything during the episode, LE said, "He just said, 'Shh. Don't talk.'"

During the portion of the interview that was not included in Prosecution Exhibit 3, the AFOSI agent asked LE if she had dated Appellant "continuously from the end of May [2016] until July 2017;" she answered, "yeah." He then asked LE when she met Appellant and when the relationship turned sexual. LE answered in May 2016 and that the relationship became sexual that same month. He asked how often they had sex, and LE said, "I would say a lot. I don't know how many times, but he just wanted it a lot." The agent said, "a lot like every day, every other day?" LE answered, "every day." She explained there were times where she did not want to have sex, and when she told Appellant that, he would "back off" but he would throw a temper tantrum, blaming her and asking her "why she didn't want it." LE said on a few occasions she would "give in" when Appellant threw tantrums, the last time occurring in December 2016. She told the agent about how she and Appellant "decided to go on a break" when LE left for basic military training. LE discussed Appellant's drug use, as well as Appellant contracting a sexually transmitted disease from another woman while LE was at basic training. LE said Appellant told her, "While you were at basic, I slept with someone, and it turns out they had chlamydia." Towards the end of the interview, the AFOSI agent asked LE, "Have you ever yourself talked to [Appellant] about the sex incident?" LE answered, "No." LE did say she had tried to contact him two days prior to the AFOSI interview to try and get some of her property back.

### c. LE's Testimony During Hearing on Defense Motions

One week prior to trial, on 28 May 2018, the Government provided the Defense with notice under Mil. R. Evid. 304(d) and Mil. R. Evid. 404(b) that it intended to offer certain statements made by Appellant against him at trial. These statements included, *inter alia*, Appellant admitting his drug use, threatening to kill LE if she ever disclosed his steroid use, threatening to go after LE's family if he could not find her, making statements to LE about her "not wanting to have intercourse at various points during their relationship,"

and Appellant asking LE "why she couldn't pay him back with sex for all the things he has done for her." The notice also included "any other statement made by [Appellant] to LE during the course of their relationship." Two days later, the Defense filed a motion to suppress those statements, attaching a portion of the AFOSI report of investigation which read, in part: "If [LE] told [Appellant] she did not want to have intercourse, [Appellant] did not pursue intercourse further but sometimes had a temper tantrum which [LE] described as having a bad and cruel attitude toward [LE]."

For reasons unclear from the record, trial defense counsel did not interview LE until 3 June 2018—the night before trial—despite the fact her interviews with law enforcement occurred in July 2017 and charges against Appellant were preferred in January 2018.[5] On the first day of trial, the court took up the Defense's suppression motion along with a defense motion to admit evidence covered under Mil. R. Evid. 412. In support of these motions, trial defense counsel marked what they described were transcripts of LE's Security Forces and AFOSI interviews as appellate exhibits.[6] While discussing the portion of the motion addressing Appellant's statements about LE "not wanting to have intercourse at various points during their relationship," trial defense counsel explained that LE told them during the defense interview that she and Appellant had disagreements over who initiated sexual conduct. Trial counsel added: "two to three days prior to [the sexual assault], there was— the couple was fighting. . . . They're fighting specifically over this, over [Appellant's] disappointment in the fact that—or desire for [LE] to kind of make the first move," and that provided context to Appellant's statements about LE not wanting to have sexual intercourse with him at various points during their relationship. Trial defense counsel said they did not need additional time to "digest" this information and that they had no objection to it being admitted during trial.

---

[5] Trial counsel apparently only conducted their first substantive interview of LE the day before trial, as well.

[6] We have reviewed these transcripts and compared them to the video recordings of the interviews attached as exhibits to the preliminary hearing officer's report. The transcripts are neither complete nor verbatim, as they both omit and misstate portions of the interviews. The record does not indicate who created the transcripts, but they were provided to the court on the first day of trial by trial defense counsel, who noted on the record that the transcript of the AFOSI interview had "not been previously provided to any party." They did not say whether or not the Security Forces interview transcript had been provided to anyone prior to trial.

The Defense called LE to the stand to testify on the motions, and during her testimony, which lasted approximately 90 minutes, LE explained she and Appellant had been fighting in the days leading up to her departure for basic military training, and the couple took a break from the relationship once she left. She explained how they reconciled during the fifth week of basic training and how Appellant called her while she was on her way to her technical training school to tell her he had cheated on her and contracted a sexually transmitted disease. LE said she forgave Appellant and moved back into his house in early May 2017 after completing her training.

Trial defense counsel commented that LE and Appellant could not "have sex" while physically separated when LE was in training, then asked, "But is it still true that you had sex every other day that you were together?" LE answered, "Yes." During trial counsel's cross-examination, LE said that after she moved back in with Appellant, they were having sex less often. Trial counsel asked, "Is that what you mean by not having sex every night?" LE answered, "Yes." On re-direct examination, trial defense counsel asked LE, "Which one's the lie? That you didn't have sex every night or you did have sex every night? Which one is the lie?" LE answered, "We didn't have sex every night." The exchange continued:

> Q. And you also told security forces investigators that the sex was every day, right?[7]
>
> A. Yes.
>
> Q. And [AFOSI]?
>
> A. Yes.
>
> Q. And so again . . . this is the first time we're hearing that there were some nights that you decided you didn't want to have sex and you didn't actually have sex. That's the first time we're hearing it?
>
> A. Yes.

Also during her direct examination on the motions, LE told trial defense counsel that during the course of her relationship with Appellant, there were around 10 to 15 times when she rejected Appellant's sexual advances, which trial defense counsel characterized as Appellant "may not have liked it, but he respected it." During trial counsel's cross-examination, LE talked about how in the days leading up to the sexual assault, LE and Appellant had been

---

[7] This issue was not discussed at all in the Security Forces interview.

fighting for a couple days, a fight which was precipitated by LE telling Appellant "no" when he was trying to initiate sexual conduct. Trial counsel asked LE if Appellant was "kind of relaying to [her] that he wanted [her] to initiate more," to which LE answered affirmatively.

LE recounted the events around 4 July 2017 when Appellant told her to move out of the apartment, threatening to call the police if she did not comply. LE said that when she returned to the apartment to get the rest of her belongings the next day she was crying, "wanting to work on [the relationship]," and Appellant "said that [they] will work on it, just not today." LE returned later in the day to pick up a desk, and had another conversation with Appellant which left LE with the belief she and Appellant would discuss their relationship "not that following weekend, but the weekend after that." LE moved back to her parents' house, explaining they did not know she was living with Appellant, as she had told them she was living with a female friend of hers.

Trial defense counsel told LE the dates of her interviews with Security Forces and AFOSI were 14 July and 21 July, respectively, and asked, "When do you think the last time you messaged [Appellant] was?" She answered, "That weekend that he was supposed—that we were supposed to talk." Trial defense counsel then asked, "Is that before or after those interviews," and LE answered, "Before." He then asked, "So you think that you stopped messaging him after that weekend?" LE responded, "Yes." The following exchange between trial defense counsel and LE then occurred:

> Q. I'm checking a calendar to have some dates to be helpful. 6 July 2017 was a Thursday. You moved back on Friday, 7 July—
>
> A. Yes.
>
> Q. —2017. Was that the weekend of the 8th and 9th, the weekend you were supposed to have the conversation?
>
> A. No. It was the weekend after that.
>
> Q. The weekend after that. So the weekend of the 15th, 16th?
>
> A. Yes.
>
> Q. So that's when you stopped contacting him, that weekend?
>
> A. Yes.
>
> Q. So even after reporting him to [Security Forces] on 14 July, you still attempted to contact him and reconcile?
>
> A. No.
>
> Q. Well, which is it, [LE]?

11

A. I eventually wanted to get back together, but I knew that it was never going to happen from that point on.

Q. Well, I understand. But I'm asking you to explain your contradictory statements.

A. Yes, I did contact him, but eventually I was told not to contact him with everything that was going on.

Q. Got it.

A. And I accepted it.

Q. So when you—just earlier when you testified that you didn't contact him after the [Security Forces interview], you lied, right?

A. Yes.

During trial counsel's cross-examination, LE said that when she returned from her technical training, Appellant confessed to having cheated on LE "a couple of times." On re-direct examination, trial defense counsel asked if this was the first time LE had disclosed Appellant had cheated on her more than once, and LE agreed it was.

The military judge granted the Defense's suppression motion with respect to Appellant's threat to kill LE or attack her family and the general "any other statement made by [Appellant] to LE during the course of their relationship" provision. The military judge denied the remainder of the motion.

### d. LE's Testimony During Findings

Two days later, LE testified for the Government in the findings portion of Appellant's trial. Between direct examination, cross-examination, and answering questions from members, LE testified for about two and a half hours. In her direct examination, LE explained there were occasions where Appellant threw temper tantrums when LE told him she did not want to have sex, and that Appellant told her he would break up with her if she didn't "start putting forth the effort." When LE was preparing to leave for basic military training in January 2017, Appellant told her he needed a break from the relationship, because she "wasn't coming onto him as much as he wanted [her] to"—meaning LE was not initiating sexual conduct as much as Appellant would like—and that LE should "think about everything when [she's] down at [basic training]." She testified that the two reunited during a telephone call while she was still at basic military training, but a few weeks later, while on her way from that training program to her technical training school, Appellant called her and told her he "cheated on [her] with a few women and had . . . contracted something." LE said she forgave Appellant after he apolo-

gized, and moved back in with him when she completed her technical training in May 2017.

LE said when she got back, the issue of who would "make the first move" flared up again, and that would lead to Appellant getting mad, which she described as "a temper tantrum until I finally did what he was wanting." LE testified that a couple days prior to the assault, Appellant attempted to initiate sexual conduct, but LE told him, "No, not now. I'm doing the dishes." This led to the couple fighting for a "few days" about their relative sex drives, generally revolving around LE not "coming onto [Appellant] first."

LE testified that after the fight had been going for those two to three days, she went to bed alone around midnight and fell asleep. At some later point, she heard the door open and Appellant come into the room. He got into the bed and started lifting up LE's shirt and pulling down her shorts and underwear. LE testified that at this point, she told Appellant, "No, I don't want this." She testified Appellant then said, "I want this." She described trying to keep her legs together with "everything that [she] had." LE then testified she "heard [Appellant's] shorts go down." As Appellant started to penetrate her vagina, LE testified she said, "I don't want this. No." LE said the penetration "hurt," and she said to Appellant, "Why are you doing this? I don't want this," and Appellant responded, "I want this." LE then testified Appellant pushed her over onto her stomach by pushing on her hip. Appellant tried to penetrate her in this position, but was not able to, and LE described him picking LE up with his hands on her hips so that she was on her hands and knees, and then penetrating her again. She said Appellant pulled her hair, leading her to stare up towards where the wall and ceiling met. She further testified that Appellant said, "'Oh, yeah,' when he finished." Afterwards, she went to the bathroom, then to the kitchen for a drink of water, eventually returning to the bed and falling asleep.

LE testified that the next morning she woke up before Appellant and waited for him to come out of the bedroom. When he did, LE asked him "why he did what he did last night," and Appellant answered, "Because I wanted it. We haven't had sex in a few days." LE said she told Appellant she "didn't want it," and Appellant then left for the gym. Despite Appellant having sexual intercourse without her consent, LE said she stayed in the relationship with Appellant.

LE testified about Appellant telling LE to leave the house around 4 July 2017 so that he could smoke marijuana with a female coworker and how he later told LE to move out on 6 July 2017. LE said she went to talk to a chaplain on 7 July 2017 because she did not want to talk to her friends or family members, and the chaplain told her to "take a week and think about it." After a week passed, LE said she decided to report Appellant's drug use to Security

Forces. Trial counsel asked her, "Why is it that you don't first come out and tell them that this man sexually assaulted you?" She answered, "I still didn't want to believe it. . . . Because then my life would just be completely different." Trial counsel revisited this topic again on re-direct examination, and LE elaborated, "I didn't want to become the victim. . . . Because then I would have been looked at differently. It would have become real." In response to a later question from one of the members as to what prompted her to go to law enforcement in the first place, LE said, "I felt like it was eating me alive if I didn't tell someone."

Shortly into his cross-examination of LE, trial defense counsel committed LE to her direct examination testimony that there were days when she and Appellant did not have sex during their relationship. He then focused LE on her testimony from when she testified two days earlier during the defense motions, and the following exchange then occurred:

> Q. Just two days ago you admitted that you lied on the stand about saying you had sex every single day?
>
> A. That was about a year ago. I can't remember everything down to the detail.
>
> Q. . . . But you admitted to lying about that, didn't you?
>
> A. Are you talking about Monday?
>
> Q. Yes.
>
> A. Yes.
>
> Q. You said, "I lied under oath."[8] That's what you said, right?
>
> A. Yes, but I'm not lying now.
>
> Q. This time? This time you're not lying?
>
> A. Yes.
>
> Q. It was just last time?
>
> A. Yes.

Trial defense counsel later returned to the frequency-of-sex theme, asking LE about her interview with AFOSI: "In fact, you said—your words were, 'Um, I would say a lot. I don't know how many times. We did it every day.' Is

---

[8] LE did not make this statement during her earlier testimony.

that what you said then?"[9] LE answered affirmatively. On re-cross-examination, trial defense counsel again brought up how frequently LE and Appellant had sex after the assault, asking, "Nearly every day?" LE answered, "Yes."

Trial defense counsel obtained LE's agreement that she did not tell Security Forces about Appellant's complaints regarding who in the relationship initiated sexual conduct and that she may have told AFOSI about Appellant being upset about her rebuffing his sexual advances but not about who initiated sexual conduct; that she had falsely denied during the earlier motions hearing she had contacted Appellant after she was interviewed by Security Forces; and that she had initially reported Appellant had cheated on her with only one woman. Trial defense counsel focused on other inconsistencies between LE's direct examination testimony and her law enforcement interviews, including the exact words she said to Appellant during the assault; that in the interviews LE had not described being on her hands and knees during the assault or Appellant pulling her hair; that she testified Appellant had his hands on her hips, but in the AFOSI interview, she said he had one hand on her hip and one on her shoulder; that she had not previously said in the law enforcement interviews that Appellant said "I want this" or "oh yeah," but rather that Appellant said "Shh. Don't talk;" and that LE did not tell AFOSI about Appellant's statement the following day, "Because I wanted it. We haven't had sex in a few days." With respect to this last point, trial defense counsel pointed out that the AFOSI agent had asked, "Have you ever talked about the sex incident?" and LE said she told the agent at the time, "No."

LE acknowledged that she "[didn't] remember everything," and that her recollection "comes in bits and pieces."

### 2. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ. We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

---

[9] This is a mischaracterization of LE's statement during her AFOSI interview. Trial defense counsel's question appears to have taken language from the imprecise transcript the Defense marked as an appellate exhibit.

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be  free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to find Appellant guilty of sexual assault, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon LE by causing penetration, however slight, of LE's vulva with his penis, and (2) he did so by causing bodily harm to her. *See Manual for Courts-Martial, United States* (2016 ed.) *(MCM)*, pt. IV, ¶ 45.b.(3)(b). "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3).[10]

---

[10] The military judge instructed the members they must find a third element: that the penetration occurred without LE's consent.

The military is a notice pleading jurisdiction. *United States v. Gallo*, 53 M.J. 556, 564 (A.F. Ct. Crim. App. 2000), *aff'd*, 55 M.J. 418 (C.A.A.F. 2001). A specification is sufficiently specific if it "informs an accused of the offense against which he or she must defend and bars a future prosecution for the same offense." *Id.* (citations omitted).

### 3. Analysis

#### *a. Legal Sufficiency*

Viewing the evidence in the light most favorable to the Government, a rational trier of fact could conclude Appellant is guilty of sexually assaulting LE beyond a reasonable doubt. LE testified Appellant penetrated her vagina with his penis without her consent and over both her verbal protests and her physical resistance. If a trier of fact credits her testimony as being true on those points, a rational conclusion is Appellant, beyond a reasonable doubt, committed the charged offense.

Appellant suggests he was tried on a theory of him placing LE in fear; however, he acknowledges there was no evidence at trial that he placed LE in fear. We agree no such evidence was presented to the members. LE did tell both Security Forces investigators and AFOSI agents that Appellant had threatened to kill her if she disclosed his drug abuse, but this information was not part of the evidence admitted during the findings portion of his trial on the sexual assault charge. As a result, we disagree with Appellant's contention the Government sought to prove he obtained LE's acquiescence to his sexual advances by employing threats or fear.

We also do not find availing Appellant's argument that the Government impermissibly pursued a theory that Appellant raped LE by using unlawful force rather than sexually assaulting her, as charged. Under Article 120, UCMJ, the offense of rape may be proven by demonstrating a sexual act that is committed "using unlawful force against that other person." *See MCM*, pt. IV, ¶ 45.a.(a)(1). "Unlawful force" is defined as "an act of force done without legal justification or excuse," and "force" includes the infliction of "physical harm sufficient to coerce or compel submission by the victim." *Id.* at ¶ 45.a.(g)(6), (5). Appellant is correct that rape and sexual assault are two different offenses and that unlawful force is not the same as the simple infliction of bodily harm. Where Appellant's argument loses traction is in its failure to recognize that sexual assault committed by causing bodily harm is a lesser-included offense of rape committed by unlawful force. *See United States v. Owens*, No. ACM 38834, 2017 CCA LEXIS 541, at *3 n.4 (A.F. Ct. Crim. App. 8 Aug. 2017) (unpub. op.) (citing *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010)). As a result, had the Government successfully proven sufficient force to amount to the unlawful force needed for a rape convic-

tion, such evidence would, by definition, be sufficient to support a conviction for the lesser-included offense of sexual assault committed by causing bodily harm. The evidence at trial indicated Appellant did use force to overcome LE's attempts to prevent the assault by keeping her legs tightly closed. Such force qualifies as an offensive touching, as it was done without LE's consent, and the Government was entitled to present evidence of this offensive touching, even if it was arguably aggravated enough to prove a greater offense.

Appellant's claim he was unaware of what theory to defend against is unpersuasive. He was charged with causing LE bodily harm by penetrating her vulva with his penis. We know of no legal principle that would prohibit the introduction of evidence of the facts and circumstances that were part and parcel of that bodily harm, which would include any force employed by Appellant to effect that bodily harm. Moreover, from her very first interview with Security Forces, LE had asserted she tried to keep her legs closed to thwart the assault. A straightforward inference from this fact is that Appellant employed some degree of force to overcome her resistance. In any event, the specification charging Appellant with committing sexual assault put him on notice of the offense he was required to defend against, and we do not agree the Government's proof at trial served to render a conviction on that specification legally insufficient.

### b. Factual Sufficiency

Having taken a fresh and impartial view of the evidence, we are convinced, beyond a reasonable doubt, that Appellant is guilty of sexually assaulting LE.

The evidence adduced at trial indicates LE was consistent in her recollection of the assault on the key aspects of the events in question. LE did provide greater—and sometimes diverging—detail after the passage of nearly one year between her initial report and her testimony at trial. In her Security Forces and AFOSI interviews admitted at trial and in her trial testimony, LE explained she and Appellant had been fighting; she went to bed alone and fell asleep; Appellant came into the room later, waking her up; Appellant started trying to have sex with LE; LE told Appellant, "I don't want to do this;" LE tried to keep her legs closed; and Appellant penetrated LE's vulva with his penis over her verbal objections and physical resistance.

That LE provided greater and differing detail after the passage of time does not equate to reasonable doubt in this case. The relevant portion of her first interview with Security Forces was just over one minute long and terminated once the investigators concluded that an offense which they did not have jurisdiction over had been committed. Even then, LE provided the basic parameters of the assault with which she testified consistently at trial. Her

second interview with AFOSI agents, one week later, was longer and more in-depth than the Security Forces interview, covering such matters as Appellant's and LE's relationship and specifics of the assault. At trial, LE testified to additional details, such as how the fight preceding the assault began, her going to the kitchen and getting a drink of water after Appellant went to sleep, and the scope of Appellant's infidelity while LE was at training.

Trial defense counsel placed a significant amount of emphasis on whether Appellant and LE had sex every day or, alternatively, nearly every day during their relationship. They further sought to draw a distinction between the source of friction in Appellant's and LE's relationship—that is, whether the couple fought over LE not wanting to have sex as often as Appellant wanted or whether they fought over Appellant's frustration that LE was not initiating sexual conduct as much as he would like. We find these purported distinctions to be insignificant, if not wholly irrelevant. LE told AFOSI agents that there were times when she would tell Appellant she was not interested in having sex and he would respect her wishes, and LE maintained this position through trial. Trial defense counsel did get LE to agree with him that she had told the AFOSI agents the couple had sex "every day." Even assuming LE made the prior inconsistent statement, we do not see this as impairing LE's credibility; rather LE used "every day" and "nearly every day" as ways to say, "very often" or "regularly." We do not conclude the distinction is evidence of poor credibility or any motive to mislead. We see even less of a distinction between LE not wanting to have sex as frequently as Appellant and Appellant being frustrated by LE's perceived lack of enthusiasm in having sex. Whatever sliver of light there is between these two framings of the same issue, it does not impugn LE's credibility.

The more notable aspects of LE's testimony are the addition of arguably new details about the assault not included in her earlier law enforcement interviews. Considering those details carefully, we do not find they give rise to reasonable doubt. In the AFOSI interview played for the members, LE said she was on her stomach, with Appellant having one hand on her shoulder and one on her hip. At trial, LE testified she was on her stomach, then Appellant lifted her by grabbing her hips with both hands therefore positioning her on her hands and knees, and he pulled on her hair with one hand as he continued to have sexual intercourse with her. We first note that LE did not specifically describe Appellant's hand placement throughout the entire assault, and her testimony was not that Appellant's hands were only on her hips the entire time. Indeed, by pulling LE's hair, one of Appellant's hands would have necessarily not been on LE's hips, but was, rather, near her shoulder. Second, when comparing the general and imprecise nature of the questions in the AFOSI interview to the detailed and specific questions posed at trial, LE's statements in the interview seem more incomplete than dishonest. Third, we

can perceive no reason for LE to manufacture such a detail, as it would not serve to make the assault any more aggravated or her testimony any more believable. Instead, we construe the detail to be one that was simply not disclosed at the AFOSI interview.

Other deviations in LE's testimony are more plausibly the product of the passage of nearly a year between her law enforcement interviews and trial, as they are shifts in peripheral details versus substantive deviations. For example, whether Appellant said, "Oh, yeah" or not when he ejaculated hardly undermines LE's initial report of sexual assault, and the same is true of whether LE said, "No, I don't want this. It's not right," as opposed to, "Why are you doing this? I don't want this." One could just as easily argue LE's testimony would have been more problematic had it been a word-for-word recitation of her law enforcement interviews from a year prior.

The aspect of LE's testimony that gives us the most pause is Appellant's confessional statement she said he made the following morning. In her testimony, LE said she confronted Appellant, asking him why he did what he did. She said Appellant responded, "Because I wanted it. We haven't had sex in a few days." She also testified she did not mention this in her AFOSI interview, when asked, "have you ever talked about this?" Notably, there is no testimony as to why this did not come out during the AFOSI interview, and trial defense counsel did not ask for an explanation. One plausible explanation is that LE did not perceive her question to Appellant and his brief response to amount to "talking about" the incident. The Defense, however, argued the inclusion of this information was a calculated decision on LE's part in order to embellish her testimony and thereby increase the likelihood of a conviction in Appellant's case. This argument might be more persuasive had the purported embellishment been part of the earlier interviews when LE's emotional reaction to Appellant breaking up with her and kicking her out of his apartment was much fresher. We are not convinced LE added this event to her testimony for an improper purpose, and we therefore do not conclude it impugns her testimony to the degree that we would either reject the rest of her testimony or find reasonable doubt because of it. Moreover, even if we were to reject this portion of her testimony, we would not reach a different conclusion as to Appellant's guilt.

Taken as a whole, LE's statements in the law enforcement interview corroborate, rather than contradict, the key and essential points of her trial testimony. We find Appellant's conviction is, beyond a reasonable doubt, factually sufficient.

### C. Admission of Prior Statements

Appellant argues the military judge erred in admitting portions of LE's recorded interviews with Security Forces investigators and AFOSI agents as Prosecution Exhibits 2 and 3, respectively. Appellant argues the interviews in the two exhibits cannot be prior consistent statements under Mil. R. Evid. 801(d)(1)(B) because they were not made before a motive to fabricate arose. Regarding Prosecution Exhibit 3, Appellant argues the military judge erred by not putting a basis for admission of the exhibit on the record[11] and by not *sua sponte* explaining to the members whether the exhibit contained prior consistent or inconsistent statements. Appellant further argues the military judge should have *sua sponte* instructed the members to disregard a portion of Prosecution Exhibit 3 under the theory it amounted to "potential uncharged misconduct."[12] Because Appellant waived these issues regarding the prior statements, we do not review them for error or grant him relief.

### 1. Additional Background

In his opening statement, trial counsel told the members, "[y]ou'll also get to hear recorded interviews, statements [LE] made to [Security Forces] investigators and to [AFOSI] agents when she reported what happened. And you'll hear that those statements in those interviews are consistent with what you hear today." The Defense, meanwhile, told the members the Security Forces investigator asked LE leading questions about the assault and that LE only said she told Appellant "no" when she was asked a third leading question. In highlighting the anticipated discrepancies between LE's in-court testimony and her statements in the earlier interviews, trial defense counsel used a series of PowerPoint slides with excerpts from both interviews, showing the interviewers' questions and LE's answers.[13] In the slides, trial defense counsel included a bullet that read: "4 June 2018—[LE] lies on the stand under oath," referring to the date LE testified on the Defense's motions.

---

[11] Appellant offers no legal basis or argument supporting the proposition that a military judge is required to state the basis for admitting an unobjected-to exhibit into evidence, and we have concluded this matter warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

[12] We do not detail the substance of the purported "uncharged misconduct," as it is not pertinent to our analysis.

[13] The excerpts on the PowerPoint slides appear to have been taken from the transcripts trial defense counsel marked as appellate exhibits. They do not accurately mirror the recorded interviews later admitted into evidence as Prosecution Exhibits 2 and 3, which were transcribed by the court reporter.

During the Government's findings case, LE testified and trial defense counsel cross-examined her, confronting her with a number of inconsistencies between her testimony and statements she made to investigators, during the motions hearing, and during her interview with the Defense. Afterwards, trial counsel called TSgt JG, the Security Forces investigator who interviewed LE on 14 July 2017, to the stand as a witness. TSgt JG testified that LE had reported Appellant's marijuana and steroid use. Trial counsel asked if there was anything else, and trial defense counsel objected on hearsay grounds when TSgt JG began to say what LE mentioned "partway through the interview." Trial counsel explained his basis for the evidence was a prior consistent statement under Mil. R. Evid. 801(d), and the military judge overruled the defense objection.

Trial defense counsel asked to be heard and told the military judge,

> I don't know that there—we had—we agreed to all these statements already, so why is there any need to show a consistent statement? Defense didn't agree with everything she said in the interview room and had it—read it to her. I don't understand the purpose of the testimony.

Trial counsel again asserted the evidence was being offered as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B)(ii), and the military judge said the objection remained overruled. TSgt JG said LE "had mentioned an incident that had involved possible sexual misconduct between her boyfriend and her," and then began to discuss a non-sexual assault in which LE described Appellant pushing her. Trial defense counsel objected, saying, "We got a [Mil. R. Evid.] 304 issue, Your Honor," and "before we get into hot water, I'd like to get a proffer of where we're going." In the ensuing Article 39(a), UCMJ, 10 U.S.C. § 839, session, trial defense counsel said, "I mean, I understand your ruling regarding the [R.C.M.] 801 issue, but I also understand your ruling regarding 304, 404. And so I just want to make sure we're all clear as to what testimony's going to come out, if we were traveling into these rights." Trial counsel responded: "I was just trying to get a general idea of what the conversation was about. I was going to move on quickly, lay a foundation for what ultimately is the recorded video of this conversation and move through that piece." Trial defense counsel said, "Satisfied with that proffer."

After determining nothing else needed to be addressed in the Article 39(a), UCMJ, session, the members returned to the courtroom, and trial counsel continued with the direct examination of TSgt JG, laying the foundation for an abbreviated recording of his interview with LE, which was still marked as Prosecution Exhibit 2 for identification at this time. Trial defense counsel briefly cross-examined TSgt JG, emphasizing that interviews are rec-

orded, in part, because memories fade over time. After TSgt JG testified, the court recessed for a little over 15 minutes. Going back on the record in an Article 39(a), UCMJ, session, the military judge stated, "We had a couple brief R.C.M. 802 sessions. Counsel appeared to agree to play a portion of a video." Trial counsel clarified they intended to play two videos.

An AFOSI agent was then called by trial counsel to lay the foundation for a recording of a portion of AFOSI's 21 July 2017 interview with LE, which was then marked as Prosecution Exhibit 3 for identification. After the agent was excused, trial counsel offered the two exhibits into evidence. The military judge turned to trial defense counsel who said, "No objection, Your Honor." The first interview was then played for the members, after which trial defense counsel told the military judge, "for the ease of the court, [Prosecution Exhibit] 2 is better heard through earphones. . . . We expect the sound quality to be much better in [Prosecution Exhibit] 3." Trial counsel proceeded to play the second interview for the members.

Once the second recording had been played for the members, the Government rested, and the Defense presented its case by admitting three documentary exhibits before resting. The military judge excused the members and outlined the findings instructions she planned to give which included instructions about prior inconsistent and prior consistent statements. The instructions did not specify any particular statements; instead the instructions generally said that there was evidence LE had made prior statements inconsistent with her testimony and prior statements consistent with her testimony. The instructions further advised the prior consistent statements could be used as evidence for the truth of the matters they asserted, while prior inconsistent statements could not. The military judge asked if either side objected, and trial defense counsel answered, "No, Your Honor." She asked if the parties would like to request any additional instructions, and trial defense counsel answered, "No additional instructions, Your Honor." After the military judge gave the members the instructions, she asked the parties if they objected to the instructions or requested any additional instructions. Trial defense counsel answered, "No, Your Honor."

In his closing argument, trial defense counsel told the members they would have the recordings of the Security Forces and the AFOSI interviews to listen to during their deliberations. His argument largely focused on inconsistencies between those interviews and LE's in-court testimony as well as the theory that the investigators had "fed [LE] the answers," leading her to falsely allege Appellant assaulted her in order to exact revenge upon Appellant.

On appeal, Appellant alleged his counsel provided ineffective assistance counsel for reasons discussed later in this opinion. Pursuant to a request by

the Government, we ordered the three trial defense counsel involved with this case to provide declarations responding to Appellant's allegations. The two trial defense counsel present throughout the findings and sentencing portions of the trial wrote in their declarations that the Defense's theory of the case was that LE had fabricated her allegations of sexual assault, and they sought to demonstrate that to the members by focusing on how LE testified to details that were absent from or inconsistent with her pretrial statements.

### 2. Law

#### a. Statements Made by an Accused

Under Mil. R. Evid. 304(d), trial counsel must disclose the contents of "all statements, oral or written, made by the accused that are relevant to the case, known to the trial counsel, and within the control of the Armed Forces, and all evidence derived from such statements, that the prosecution intends to offer against the accused" prior to arraignment. In the case of statements by the accused not disclosed before arraignment, "the prosecution must provide timely notice to the military judge and defense counsel," and defense counsel may object at that time. Mil. R. Evid. 304(f)(2).

#### b. Prior Consistent Statements

Mil. R. Evid. 801(d) identifies certain types of out-of-court statements which are not hearsay. Pertinent here is Mil. R. Evid. 801(d)(1)(B) which exempts a declarant-witness's prior, out-of-court statement which is consistent with trial testimony under two circumstances: (1) when the statement is offered to rebut a charge that the declarant recently fabricated the trial testimony or gave the testimony due to a recent improper influence or motive, Mil. R. Evid. 801(d)(1)(B)(i); or (2) when the statement is offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground," Mil. R. Evid. 801(d)(1)(B)(ii). Prior consistent statements under this rule need not be identical to trial testimony, but must only be "'for the most part consistent' and in particular, be 'consistent with respect to . . . fact[s] of central importance to the trial.'" *United States v. Finch*, 79 M.J. 389, 395 (C.A.A.F. 2020) (quoting *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988)). When offered under Mil. R. Evid. 801(d)(1)(B)(ii), such statements must also "be relevant to rehabilitate the witness's credibility on the basis on which he or she was attacked." *Id.* at 396. When admitted as non-hearsay under this rule, the statements are substantive evidence. *Id.* at 395.

#### c. Waiver

Claims of error with respect to the admission of evidence are preserved if a party both timely objects to the evidence and states the specific ground for the objection. Mil. R. Evid. 103(a)(1). When an appellant fails to make a timely objection to the admission of evidence at trial, that error is forfeited in the

absence of plain error. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)) (additional citations omitted). However, under the ordinary rules of waiver, when an appellant affirmatively states he has no objection to the admission of evidence, the issue is waived and his right to complain about its admission on appeal is waived. *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)).

Under R.C.M. 920(f), the absence of an objection to a particular instruction or to the omission of an instruction prior to the members starting their deliberations forfeits the objection. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citations omitted). When an appellant affirmatively declines to object to the military judge's instructions, this amounts to an express and unequivocal acquiescence to the instructions and waives objections to them. *Id.* (citations omitted).

The Court of Appeals for the Armed Forces (CAAF) cannot review waived issues, because an affirmative waiver leaves no error to correct on appeal. *Id.* (citation omitted). Pursuant to Article 66(c), UCMJ, the Courts of Criminal Appeals have the unique statutory responsibility to affirm only such findings of guilty and so much of the sentence that is correct and "should be approved." 10 U.S.C. § 866(c). Thus, we retain the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018).

### 3. Analysis

Appellant waived any error with respect to the admission of Prosecution Exhibits 2 and 3. Appellant was aware of this evidence in advance of trial, as both recordings were provided to the Defense in discovery and admitted as exhibits at the preliminary hearing. Trial defense counsel also offered what purported to be transcripts of the interviews as appellate exhibits in furtherance of the Defense's pretrial motions and made inconsistencies between LE's trial testimony and the interviews the core of Appellant's defense. When offered into evidence at trial, trial defense counsel unequivocally said they had no objection to the recordings.

Moreover, the record of trial strongly suggests trial defense counsel more than acquiesced to the admission of the recordings; they more likely agreed outright with them being admitted. Trial defense counsel did not seek a pretrial ruling as to the admissibility of the recordings and opened their case with a PowerPoint presentation which included questions posed during the interviews and the answers LE gave, immediately after trial counsel told the members in the Government's opening statement that they would "hear recorded interviews." Trial defense counsel objected when TSgt JG started to

repeat something LE said during his interview, but once the parties were in an Article 39(a) session, trial defense counsel said, "I just want to make sure we're all clear as to what testimony's going to come out." Trial counsel said he was laying the foundation for the recorded interview, to which trial defense counsel replied, "Satisfied with that proffer." The military judge later summarized an R.C.M. 802 conference, saying "counsel appeared to agree to play a portion of a video" (and trial counsel noted on the record there would be two videos). Trial defense counsel told the military judge they had no objection to the admission of the recordings, and once the first recording was played for the members, trial defense counsel explained how it was "better heard through earphones," strongly suggesting the Defense wanted the members to hear and carefully listen to the recordings. The recordings played for the members were not the entirety of the interviews; rather, they were excerpts created without any pretrial litigation, suggesting trial counsel and trial defense counsel had come to an agreement off the record as to what portions of the interviews would be admitted. Combining the foregoing with the Defense's approach—as explained in their post-trial affidavits—of attacking LE's credibility by focusing on discrepancies between LE's in-court testimony and her statements during the interviews, we conclude the Defense purposefully allowed the admission of Prosecution Exhibits 2 and 3. As such, issues regarding the contents and admission of these exhibits have not merely been forfeited—they have been waived.

Contrary to Appellant's claim on appeal, trial defense counsel objected to a portion of TSgt JG's testimony, not to the admission of Prosecution Exhibit 2. Appellant urges us to construe this objection as an objection to both Prosecution Exhibit 2 and Prosecution Exhibit 3. We do not find any merit in this contention. Trial defense counsel did not object to the exhibits at all, much less advance a specific ground for objecting to them, as required under Mil. R. Evid. 103. Trial defense counsel objected on hearsay grounds to a question that would elicit the fact LE had alleged during the Security Forces interview Appellant sexually assaulted her. After this objection was overruled, TSgt JG started discussing an uncharged physical assault LE had disclosed during the interview when trial defense counsel again objected, saying, "we got a 304 issue," and then asked for "a proffer of where we're going." Once trial counsel explained he intended to lay the foundation for the recorded interview, trial defense counsel said he was satisfied with that proffer and indicated no objection to the admission of the recording. Similarly, trial defense counsel made no objection to Prosecution Exhibit 3, the foundation for which was laid by a different witness.

Mil. R. Evid. 304 pertains to Appellant's statements, not statements by other witnesses. At the most, trial defense counsel's statement, "we got a 304 issue," would only serve to indicate an objection to evidence insofar as it in-

cluded statements made by Appellant. By saying he wanted a proffer as to what evidence was going to be elicited, trial defense counsel indicated he needed additional information to determine whether to object. Once trial counsel explained their intent to lay the foundation for Prosecution Exhibit 2, trial defense counsel retreated, saying he was "[s]atisfied with that proffer," effectively withdrawing his earlier objection as to the "304 issue." At the very most, the Defense objected to a portion of TSgt JG's testimony. We see no evidence of a defense objection to either of the interview recordings, and we decline to impute an objection to the recordings from the objection to TSgt JG's testimony.

Appellant's assertion that the military judge should have provided instruction to the members as to whether the statements in the recordings amounted to prior consistent or inconsistent statements was similarly waived. The parties discussed the military judge's proposed findings instructions before she gave them to the members, and trial defense counsel said they neither had any objection to the proposed instructions nor requested any additional instructions. After the instructions were given, trial defense counsel again said they did not object or request any additional instructions. Thus, trial defense counsel did not merely not object to the instructions—they affirmatively declined to object.

We have considered whether we should grant relief under our Article 66(c), UCMJ, authority in spite of these waivers and decline to do so. The recorded interviews were evidently admitted in accordance with the Defense's trial strategy, and we perceive no unfair prejudice to Appellant that would warrant piercing his affirmative waiver.

### D. Consent Instruction

Appellant argues the military judge gave the members an erroneous instruction regarding consent.

The instruction given by the military judge was:

> "Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

> Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in de-

termining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions.

If the person has the ability to consent, but does not do so because of some external influence counteracting voluntariness, the sexual conduct is not voluntary.

Appellant's argument is that there was no evidence Appellant placed LE in fear and that—because LE testified she both verbally and physically resisted Appellant—there was no evidence of a "lack of verbal or physical resistance." Appellant further argues there was no evidence of an "external influence counteracting voluntariness," so the military judge's instruction misled the members.

Trial defense counsel, however, did not object to this instruction. As discussed above, trial defense counsel explicitly declined the opportunity to object to the findings instructions, thereby waiving appellate review of this issue. *See Davis*, 79 M.J. at 331 (citations omitted). Even if we were to conclude Appellant had forfeited this issue at trial, rather than waiving it, we would not find plain error with the military judge's instructions, as the instruction above is an accurate statement of the law. *See United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016) (recognizing cases in which a victim has the ability to communicate consent "but does not articulate non-consent out of fear or due to some other external compulsion counteracting voluntariness").

### E. Trial Counsel's Closing Argument

Appellant argues the senior trial counsel committed prosecutorial misconduct in his closing argument by disparaging Appellant; accusing Appellant of uncharged misconduct; commenting on Appellant's right to confront the witnesses against him; vouching for evidence; and misstating the military judge's instructions. We agree with Appellant in part, but we determine Appellant was not prejudiced.

#### 1. Law

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). Under the plain error standard, such error occurs "when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should char-

acterize the conduct of such an officer in the prosecution of a criminal offense.'" *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *Sewell*, 76 M.J. at 18 (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001). We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

"Improper vouching occurs when the trial counsel 'places the prestige of the government behind a witness through personal assurances of the witness's veracity.'" *Fletcher*, 62 M.J. at 180 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). Trial counsel may, however, marshal evidence in support of the proposition that a witness testified truthfully and argue that witness told the truth on the stand. *United States v. Chisum*, 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016), *aff'd on other grounds*, 77 M.J. 176 (C.A.A.F. 2018).

When we find error with respect to Government argument, we assess for material prejudice and only reverse "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Sewell*, 76 M.J. at 18 (citation omitted). In assessing prejudice from improper argument, we analyze: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *See United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (citation omitted); *Fletcher*, 62 M.J. at 184. Our superior court has identified five indicators of severity: "(1) the raw numbers—the instances of misconduct as compared to the overall length of the argument; (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge." *Fletcher*, 62 M.J. at 184 (citation

omitted). In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 2. Additional Background and Analysis

Trial defense counsel objected three times during trial counsel's closing argument, and each objection was sustained. As a result, Appellant's allegations of error regarding portions of the closing argument to which defense counsel did not object are all reviewed for plain error. Trial counsel's long and occasionally wandering argument countered the Defense theory that LE had falsely reported the assault as an act of revenge as well as addressed several challenges of the Government's case: the evolution of LE's testimony, LE's delayed reporting of the assault, and the fact there was minimal evidence to corroborate LE's testimony, other than her pretrial law enforcement interviews. On appeal, Appellant makes wide-ranging attacks against trial counsel's argument, not all of which warrant discussion.[14] We address the assertions of error which do below. We conclude trial counsel did commit error in certain aspects of his argument, and we analyze those errors for prejudice to Appellant.

### a. Disparagement of Appellant's Character

The Defense's theory throughout the trial was that LE had fabricated her allegation of sexual assault as part of a scheme to exact revenge on Appellant because he broke up with her. During LE's cross-examination, trial defense counsel challenged LE regarding the opportunities she had to report the assault sooner than she did, the fact she went back to bed with Appellant after the assault, and the fact she continued to have sexual relations with him after the assault.

We disagree with Appellant's contention that trial counsel committed plain error when he argued LE might view Appellant as a "monster, liar, and a terrible human being." At this point in the argument, trial counsel was discussing why sexual assault victims might not immediately admit, even to themselves, that they had been assaulted by a loved one. He hypothesized such an admission changes a person's life in that they take on the label of being a victim as well as calls for a dramatic reassessment of everything that

---

[14] For example, we perceive nothing improper with trial counsel invoking an analogy to "the telephone game" without first admitting evidence about the game. The fact the analogy was not particularly apt does not rise to the level of improper argument.

person previously thought about their attacker. In following this thread, trial counsel suggested one difficulty confronting LE was that if she acknowledged Appellant had assaulted her, she would be concluding she had "just spent 13 months with a monster, a liar, a terrible human being." He argued LE stayed with Appellant after the assault because she did not want to "identify the person that [she loved] as a monster and leave" or that Appellant was "capable of what just happened."

It is a fair inference that a person who has been assaulted may adopt an extremely negative view of their attacker. Similarly, if the attacker is a loved one, that view may be difficult to contemplate or reconcile with otherwise positive aspects of the relationship. The inference is pertinent to this case as LE testified that even when she first began talking to the Security Forces investigators, she did not allege Appellant had sexually assaulted her, because she "still didn't want to believe it." That being said, this sort of argument is fraught with peril, as it can amount to a back door for a prosecutor to improperly demean an accused by casting his own epithets as the hypothetical views of someone else. Considering the context in which trial counsel made this statement, we do not find plain error, but we also find this a close call and caution trial practitioners against employing this tactic given how close it comes to trial counsel insinuating he believes or the members should conclude Appellant is a monster or a liar.[15]

### b. Accusing Appellant of an Uncharged Offense

Appellant asserts trial counsel improperly argued that Appellant had been charged with raping LE, as opposed to sexually assaulting her.

Trial counsel used the word "rape" six times in his closing argument. The Defense objected twice—on the first occasion, trial defense counsel asserted it was a mischaracterization of the charged offense and, on the second, trial defense counsel just said, "it's 304."[16] The military judge sustained both objections. Of the four uses that were not objected to, the first came when trial counsel was discussing what he described as LE's "distinct change in demeanor" as she testified. He said the members needed to assess whether the change came because she was trying to remember what she said in prior in-

---

[15] Notably, other than the fact Appellant cheated on LE while they were separated, no evidence was introduced suggesting that Appellant had lied about anything, and he did not testify, so there would be scant basis for interpreting this comment as calling Appellant a liar.

[16] We are unable to discern from the record what trial defense counsel was referring to.

terviews, deciding what she should tell the members, "or if she was reliving the night . . . that the man who loved her raped her."

The second unobjected-to use of the word came when trial counsel was blending a general discussion about counterintuitive victim behaviors and LE's testimony. He said,

> They do things that we don't understand. They don't run away, they don't scream, they don't fight back hard enough. They go to the kitchen and get a class [sic] of water, and then they walk back into the room and lie next to the man who raped them. And all they could think about as they lie there is "Why didn't I just leave?"

Trial counsel used the word a third time when he was discussing LE's word choice when she revealed she had been assaulted. He argued that a person making a false allegation would use "trigger words" like "sexual assault" or "rape" to unequivocally make the accusation, as opposed to LE's more ambiguous statement to law enforcement that Appellant "forced himself on [her] one night."

On the fourth and final time trial counsel said "rape" without objection, he was arguing in rebuttal that the law does not require victims to behave in particular ways in order to be credible, and he said, "See, what that is, it's putting a requirement on someone that if you don't react this way, then you couldn't have been raped, you couldn't have been sexually assaulted, you couldn't have had this happen to you, you can't be a victim, because you didn't react how we want."

Appellant was not charged with raping LE. Rather, he was charged with sexually assaulting her, a lesser-included offense of rape. Considering the length and context of the entire argument, we conclude trial counsel simply misspoke the first two of the unobjected-to times he used the word "rape"—we do not interpret trial counsel as purposefully suggesting that Appellant committed the greater offense. The third time trial counsel used the word, he was contrasting LE's word choice, notably that she did *not* say either "rape" or "sexual assault," which was proper argument. The fourth time trial counsel said "rape," he was rebutting the Defense's attack on her credibility and behavior and referred to both the uncharged offense of rape and the charged offense of sexual assault. The better argument would have not have referred to the uncharged offense of rape at all, but trial counsel was not accusing Appellant of rape; rather, he was arguing victims need not behave in particular ways in order to have a valid complaint of sexual assault.

We note that trial counsel was not alone in being imprecise on this front, as "rape" was first used in the court-martial by trial defense counsel during

his cross-examination of LE, twice asking about the shirt LE said Appellant "raped [her] in." Given that Appellant was not charged with rape, trial counsel's first, second, and fourth unobjected-to uses of the term "rape" amounted to error which was plain and obvious. We find no error with respect to his third use. Although we conclude trial counsel committed plain error, we find no prejudice considering neither of the parties told the members about the elements of rape, trial counsel did not argue the members could or should assess whether Appellant raped LE, the military judge's instructions only pertained to sexual assault, and the members were not given the option of returning a conviction for rape.

### c. Commenting on Appellant's Right to Confront Witnesses

Appellant argues trial counsel improperly commented on his right to confront LE by characterizing the Defense's cross-examination as "victim blaming."

Trial counsel discussed the members' obligation to judge the credibility of witnesses, and in doing so, he said the members should not hold LE to a "perfect" standard. He further noted that seemingly counterintuitive behaviors by a victim do not necessarily mean that person is lying, arguing:

> And baring her soul as we throw pins at her and throw darts at her, ask her why she didn't do this or why she didn't do that. Victim blaming. Talk about how she still had sex with this man. And we all kind of think to ourselves, "I can't believe this. This can't be true." Until we actually peel the layers back, until we peel the onion back and understand human nature and where we're coming from.

During rebuttal, after the Defense had argued that LE's conduct belied her intent to frame Appellant for an offense he did not commit, trial counsel argued:

> And the whole victim blaming, "Well, she moved this way and maybe she didn't say enough" and all that stuff, and she was hurt by the end of the relationship, absolutely. Absolutely. "She didn't report fast enough." Well, there's no requirement, right? I mean, there's no threshold requirement on when you can report. There's no threshold requirement. The first couple things that were discussed just now was credibility, and we're talking about credibility, but why stay after the sexual assault, she's had sex with her assaulter, she didn't report fast enough, she didn't get treatment fast enough, and she didn't use our resources. That is all called victim blaming. Those are putting

requirements on someone. In order to invoke your right to consent, you must react this way.

. . . No, it doesn't go to—that doesn't go to credibility. That's not what it goes to.

What it goes to is distraction. What it goes to is victim blaming. What it goes to is putting her on trial. Putting her on trial. Why? Because she was in love with someone who assaulted her. And because damn it, she didn't leave him right away. And how dare she?

Appellant's argument that trial counsel's invocation of "victim blaming" was improper rings hollow in the face of the Defense's theory that LE made a false allegation of sexual assault as part of a vindictive plot. That is, the Defense squarely blamed LE for the fact Appellant was on trial for sexual assault in the first place, describing her in the Defense opening statement as "a young, heartbroken girl who is seeking revenge." In closing, trial defense counsel said of LE, "We know she can live the big lie for a long time and she can keep it up." The Defense further argued LE's thought process was, "If I can't have [Appellant], nobody else is going to have him, certainly not this new woman in his life." The Defense told the members "credibility is everything in this case" and then attacked LE's credibility by pointing to LE staying with Appellant after the assault; having sex with Appellant in the days following the assault; not seeking medical treatment; and not telling anyone about the assault right away. The Defense was entitled to—and did—attack LE's credibility. Trial counsel was similarly entitled to refute the Defense's theory by asserting the Defense was trying to distract the members by blaming LE, and his unobjected-to argument does not amount to plain error.

### *d. Vouching for Evidence and LE's Credibility*

Appellant argues trial counsel improperly vouched for the evidence and LE's credibility by injecting his personal opinion in his argument. We agree.

Trial counsel proposed an analytical framework for the members to use in assessing the evidence in the case and applying the evidence to the law. As part of that framework, he told the members that if they believed either "this night never happened" or that LE and Appellant did not "ever [have] sex like that," then they should

just knock on the door. Don't let the man sitting behind me sit here accused any longer. Just acquit him. *But I know that none of you will do that.* Because at the end of the day, *we do believe that it happened.* Here, here and up here [pointing to his stomach, his heart and his head].

(Emphasis added). The Government concedes this passage amounted to trial counsel improperly offering his personal views on the evidence. The Government further concedes trial counsel committed plain and obvious error. We agree. Trial counsel, however, continued:

> And once you make that leap, once you decide that you believe [LE] that this night occurred, and you say sex happened, well, you've gone by something. You've gone by the falsity narrative. You've gone by the "lover scorned making it all up" narrative. You've pushed that aside. Because now you've started to believe. *Because it happened.*

(Emphasis added). This portion of trial counsel's argument presents a closer call. One of trial counsel's tactics in his argument was to walk the members through a proposed framework for applying the facts of the case to the military judge's instructions. Essentially, he would tell the members that if they believed some portion of LE's testimony, then the members should reach a certain conclusion or accept some intermediate proposition, thereby advancing through the framework. Although there is nothing inherently problematic with this approach, trial counsel's method of implementing it created the real risk that members would conclude trial counsel was telling members what he believed, as opposed to what the evidence showed.[17]

A careful reading of the above "once you make that leap" segment of trial counsel's argument in the context of his entire argument indicates that when he said, "because it happened," he was saying that once the members believed "the night happened," then they could dispense with the Defense's theory that LE had falsely alleged the entire event. By saying, "because it happened," instead of "because *you believe* it happened," trial counsel set the stage for Appellant's argument that he was vouching for LE, as the statement "because it happened"—taken out of context from the rest of trial counsel's argument—certainly sounds like he is offering his personal endorsement that "it happened." Had this comment been trial counsel's sole misstep, we might conclude he did not commit plain error. However, trial counsel's "because it happened" line came almost immediately after his impermissible statements

---

[17] For example, at another point in his argument, trial counsel used the personal pronoun "I" in discussing the analysis of the evidence. It is clear from the context he was referring to how a member's thought process might proceed, not to his personal opinion. Considering how such comments can easily be misconstrued when they are divorced from an argument's larger context, trial counsel are well advised to avoid personal pronouns in argument, especially when discussing issues such as credibility. *See United States v. Fletcher*, 62 M.J. 175, 180 (C.A.A.F. 2005).

that he "knew" none of the members would immediately acquit Appellant and that "we do believe that it happened." By placing "because it happened" in such close proximity to his other personal endorsements of the evidence, trial counsel compounded the original error, and as a result, we conclude his "because it happened" comment was plain error as well.

We further find trial counsel committed plain error by vouching for the evidence in a third instance. Trial counsel drew an objection after asserting, "There is no evidence for you to find reasonable mistake of fact." The military judge then advised the members that her instructions controlled in the event counsel made statements inconsistent with them. Trial counsel continued,

> Members, there is no finding at all. Search your notes. See if you can find it. See if you can find how someone could have truthfully and reasonably mistook [LE's] response as consent. *And if you can, wow. Different trial you might have been watching.* Because it's not there. There's nothing about "No, stop, don't." There's nothing about noncooperation, nonparticipation that would even be suggestive of consent. There just isn't.

(Emphasis added). Evidence supporting Appellant's mistake of fact defense was minimal, at best, and pointing out the lack of such evidence was a permissible government tactic. Trial counsel went farther, however, by suggesting that the only way the members could find support for the defense was if they heard evidence trial counsel did not personally hear. His statement, "Different trial you might have been watching," can easily be reframed as, "I was here for this trial, I heard the evidence, and I did not hear any evidence supporting that defense." Trial counsel's use of "wow" as an expression of disbelief further telegraphed to the members that trial counsel personally believed they would be wrong if they reached a different conclusion. Trial counsel could have properly told the members that whatever evidence supported the Defense was refuted by other evidence in the case. Yet, trial counsel went further, offering his personal assessment of the evidence as he observed it. This insertion of his personal opinion amounted to improper vouching for the evidence—or, rather, lack thereof—in support of a mistake of fact defense and was plain error.

### e. Misstating the Military Judge's Instructions

At another point in his argument, trial counsel was explaining why the members did not have any physical evidence to corroborate LE's testimony. He said:

> But what other evidence would there be? See, because this is the tricky thing about this type of event and this type of violence. It happens in a room on just another night and no one

> else is there. And it happens to a person who's not going to call the cops right away. And if the threshold requirement we have for that individual's experience to be validated is they need more, then that person can never have the right to consent. They lose it. If we sit here and tell [LE], "Your testimony can never be enough," she'll never have the right to consent. That's why it happens like this. That's why the stuff you see on TV is on TV. The guy in the hood with the gun who jumps out of the forest. That's not how this stuff happens. That's not real.

Appellant argues trial counsel misstated the military judge's instruction on credibility and that "trial counsel essentially guilted the panel members into convicting Appellant by implying an acquittal sends a 'chilling message' that complainants are not to believed." This argument was not objected to at trial, and Appellant neither cites any authority regarding this alleged error nor elaborates any further on it. We note the military judge told the members that they had the duty to determine the believability of the witnesses and that they should consider, *inter alia*, "the extent to which each witness is either supported or contradicted by other evidence" and whether discrepancies "resulted from an innocent mistake or a deliberate lie." We fail to see how the above portion of trial counsel's argument misstated the military judge's instructions.

Contrary to Appellant's argument on appeal, trial counsel did not suggest that an acquittal would send a broader message about the believability of crime victims, nor did he argue victims should automatically be believed. What trial counsel did discuss was that LE's testimony, which—along with her pretrial statements—was the only evidence supporting the sexual assault charge. He further correctly argued LE's testimony alone could be sufficient to convict Appellant if the members found her credible. This was an accurate view of the evidence and the law as well as a straightforward rejoinder to the Defense's theme of LE's testimony being unworthy of belief.

Where trial counsel's argument veers off this path is in his invocation of LE's purported "right to consent" and his suggestion that LE would lose this right on some future occasion not before the court. Trial counsel referenced a "right to consent" one other time in his rebuttal argument, and it appears what trial counsel was referring to was a person's right to *not* consent to sexual activity. His argument was essentially that a person does not lose the ability to assert a lack of consent simply because there is no corroborating evidence or because there was a delayed report of an assault or because the person remained in a relationship with the attacker. We agree with the validity of this premise; however, the concept of LE losing her ability to assert a lack of consent at some later date was wholly irrelevant to Appellant's trial,

and trial counsel improperly referred to this speculative and collateral concept. Similarly, the members' conclusions about the adequacy of the evidence in this case have no bearing on LE's "right to consent." We conclude the inclusion of the statement, "she'll never have the right to consent," was plain and obvious error.

### f. Prejudice of Improper Argument

The senior trial counsel in this case made improper argument by describing the offense Appellant was charged with as rape, by vouching for the evidence, and by arguing LE would "never have the right to consent." Considering the factors in *Halpin* and *Fletcher*, we conclude the severity of the improper aspects of his argument to be low. The segments we find to be plain error are largely clustered in a 2-page-long section of an hour-long argument which spanned 17 pages in addition to 4 pages of rebuttal argument in the trial transcript. None of the improper comments were repeatedly invoked, and trial counsel did not employ them as a theme or device elsewhere in his argument. The trial on the merits on the single specification of sexual assault, excluding closing arguments and instructions, lasted one day, and the members deliberated for just under two hours. When trial defense counsel objected to trial counsel's statement that there was no evidence supporting the defense of mistake of fact, the military judge told the members that her instructions controlled in the event of any conflicts. Further, the military judge told the members that argument by counsel was not evidence, that they must determine the issues of the case based on the evidence as they remember it, and to apply the law according to her instructions.

The lack of defense objection to two of the three areas of improper argument (indeed, to the vast majority of errors Appellant now complains of) indicates the minimal impact of the argument, especially in light of trial defense counsel's frequent objections during other portions of the trial. Although the case hinged on LE's credibility, the key aspects of her allegations did not change over the year that elapsed between the assault and her testimony at trial. Trial defense counsel did demonstrate a plausible motive for LE to fabricate an allegation of sexual assault as well as point out inconsistencies between her testimony and her pretrial law enforcement interviews, but trial defense counsel failed to successfully impeach her such that her testimony should be deemed incredible or give rise to a reasonable doubt as to Appellant's guilt. We are confident trial counsel's missteps in his closing argument—which we do not endorse or excuse—did not serve to impermissibly tip the scales, and we are likewise confident the members followed the military judge's instructions and convicted appellant on the basis of the evidence alone. Based upon our analysis of this issue, we need not address Appellant's

contention that the military judge had a duty to *sua sponte* "interrupt and end" trial counsel's argument in this case.

### F. Disclosure of Evidence

After trial, the Defense filed a motion for appropriate relief, requesting either a new trial or dismissal of the sexual assault charge based on an allegation the Government failed to disclose exculpatory information arising from trial counsel's pretrial interview of LE. The military judge denied the motion, and Appellant now argues the military erred in doing so.

#### 1. Law

Government prosecutors must disclose favorable evidence upon request by the defense "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). When the evidence is "obviously of substantial value to the defense," the prosecution must turn over the information regardless of whether there is a defense request. *United States v. Agurs*, 427 U.S. 97, 110 (1976) (footnote omitted). The *Brady* obligation extends not only to exculpatory evidence, but impeachment evidence, as well. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citation omitted).

*Brady*, as interpreted by *Giglio*, is violated when evidence favorable to an accused—that is, either exculpatory or impeaching—is suppressed by the Government and the accused is thereby prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Relief is available when "'there is a reasonable probability' that the result of the trial would have been different" had the evidence been turned over. *Id.* at 289. The United States Supreme Court has further framed this inquiry as whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Under the UCMJ, "the defense is entitled to equal access to all evidence, whether or not it is apparently exculpatory." *United States v. Garries*, 22 M.J. 288, 293 (C.M.A. 1986) (citation omitted). R.C.M. 701(a)(2)(A) requires trial counsel to disclose, upon defense request, "books, papers, documents, photographs" and other physical evidence "within the possession, custody, or control of military authorities" which are "material to the preparation of the defense," intended for use by trial counsel in the prosecution's case-in-chief, or were obtained from the accused. Evidence which is material to the defense's preparation is that which might inform the accused how to plead, what lines of investigation to pursue, and what defenses or trial strategies to adopt. *See, e.g.*, *United States v. Webb*, 66 M.J. 89, 92 (citation omitted). Even in the absence of defense request, R.C.M. 701(a)(6) requires the disclosure of evidence

known to trial counsel that tends to negate guilt, reduce the degree of guilt, or reduce punishment. Pursuant to R.C.M. 701(f), notes and working papers of counsel and counsel's assistants are specifically exempted from R.C.M. 701's disclosure requirements.

When the defense makes a specific request for discoverable evidence and trial counsel fails to turn over such, the appellant is entitled to relief absent a showing that the nondisclosure was harmless beyond a reasonable doubt. *United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004)). Such a failure is not harmless beyond a reasonable doubt "if the undisclosed evidence might have affected the outcome of the trial." *Id.* (quoting *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013)).

However, when the defense makes only a general request for discovery, wrongful nondisclosure will result in relief only upon "showing that there is a 'reasonable probability' of a different result at trial if the evidence had been disclosed." *Roberts*, 59 M.J. at 326–27 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (additional citations omitted).

We review a military judge's denial of a motion for a new trial for an abuse of discretion. *See. Webb*, 66 M.J. at 92 (citation omitted). An abuse of discretion occurs when a military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *Id.* at 93 (citations omitted). Requests for new trials "are generally disfavored" and are "granted only if a manifest injustice would result" by denying the request. *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

### 2. Additional Background

Prior to trial, on 17 April 2018 and 25 April 2018, trial defense counsel generally requested evidence tending to diminish the credibility of any potential witnesses.[18] Also on 25 April 2018, trial defense counsel submitted a third request asking for, *inter alia*, "statements made by [LE] to the prosecu-

---

[18] The discovery request sought: "All known evidence tending to diminish the credibility of witnesses or alleged victims or alleged co-actors including, but not limited to: (1) prior civil, foreign, or military convictions . . . (2) evidence of other character, conduct, or bias bearing on witness credibility including, but not limited to, evidence of prior to [sic] non-judicial punishment . . . and adverse administrative actions or discipline in the government's possession or reasonably obtainable."

tion, including those made by adoption through Special Victims Counsel, regarding both the facts of its case and its disposition." Trial defense counsel repeated this latter request on 20 May 2018. The Government responded that this information had been previously provided.

The day before trial, on 3 June 2018, the government and defense trial teams separately interviewed LE. This was apparently the first time either side conducted a substantive interview with her. At some point that day after the interviews, trial defense counsel asked trial counsel if they would be providing a *Brady* notice based upon information obtained during the interview. Trial counsel orally told trial defense counsel about certain items of information government counsel had learned. The next day, the Defense called LE to testify on the defense's motions, and two days after that, on 6 June 2018, the parties gave their opening statements and LE testified on the merits. The court-martial adjourned on 8 June 2018 after the members announced Appellant's sentence.

Two days after trial concluded, trial defense counsel sent trial counsel an email stating the Government had not provided the Defense with a written *Brady/Giglio* notice. Trial defense counsel described the information trial counsel had previously orally provided as: (1) LE said her final position during the assault was on her hands and knees; (2) both of Appellant's hands were on her hips; and (3) she got a drink of water after the assault. Trial counsel responded that in their interview, LE had said: she told Appellant, "no, not tonight, I don't want this;" that she thought to herself, "I don't want this, he should stop;" that she said, "no" and "ow, that hurts, stop;" and that the "second position" involved LE on her hands and knees with both of Appellant's hands on her hips. This led to trial defense counsel requesting—for the first time—copies of notes taken by the government paralegal during the interview, which the Government eventually provided in July 2018. Following this disclosure, the Defense requested the military judge either dismiss the sexual assault charge or declare a mistrial based upon allegations trial counsel had failed to disclose matters from their interview with LE.

The military judge conducted a post-trial Article 39(a), UCMJ, session on 14 August 2018 which included testimony from the government paralegal who took notes during the government interview of LE; an affidavit and notes from the defense paralegal who took notes during the defense interview of LE; and an affidavit from trial counsel. Trial counsel also provided assistant trial counsel's notes from the same interview mid-way through the post-trial session, after which the court recessed for about ten minutes. When the parties returned, the military judge asked trial defense counsel if he needed more time to review the notes, and he replied, "No, Your Honor. We're prepared."

The military judge issued a written ruling on 23 September 2018 concluding that any failure to disclose evidence was harmless beyond a reasonable doubt and that neither dismissal of the charges nor a mistrial was warranted.

On appeal, Appellant argues trial counsel improperly failed to disclose certain statements made by LE during their pretrial interview with her, specifically:

(1) That Appellant would complain that LE would not engage in a particular sexual act as frequently as he wanted;

(2) That Appellant was "picky" about LE's initiation of sexual conduct with him;

(3) That Appellant had been becoming rougher during sexual intercourse;

(4) That Appellant had his leg between LE's legs during the assault;

(5) That Appellant should have heard her say "no" during the assault;

(6) The full name and contact information for the woman LE had told her parents she was living with;

(7) That Appellant was wearing sweatpants when he entered the bedroom, then changed into shorts;

(8) That she said "ow, stop, that hurts" during the assault; and

(9) That she confronted Appellant the following morning about the assault.

### 3. Analysis

In reviewing this allegation of error, we first determine whether Appellant's pertinent pretrial discovery requests were general or specific. In doing so, we follow the three-part test set out by our sister court in *United States v. Ellis*, 77 M.J. 671 (A. Ct. Crim. App. 2018). That court determined a request was specific if it: (1) identifies "the specific file, document, or evidence in question;" (2) identifies the location of the evidence or its custodian, if the evidence is not in trial counsel's possession; and (3) includes "a statement of the expected materiality of the evidence to preparation of the defense's case unless the relevance is plain." *Id.* at 681.

Trial defense counsel only made a general discovery request for information when they requested "all known evidence tending to diminish the credibility of witnesses or alleged victims or alleged co-actors." Such a request did not identify any specific item of evidence and did little more than restate

the Government's existing obligations under *Brady*.[19] Similarly, the Defense's request for statements made by LE "regarding both the facts of its case and its disposition" was a general request, seemingly encompassing anything and everything LE said to the Government about her case at any point and found in any source. The request provided no further detail and did not include any indication of the expected materiality of the requested evidence. A literal interpretation of such a broad request would require government counsel and their paralegals to document every statement made to them by LE and provide it to Defense, a practice described by the United States Supreme Court as serving "no legitimate purpose." *Hickman v. Taylor*, 329 U.S. 495, 513 (1947). Even considering the broad discovery rights in military justice practice, such a request is facially overbroad and runs far afield of requesting specific items of evidence. Appellant argues this general request compelled trial counsel to turn over notes taken by a Government paralegal during trial counsel's interview as matter of routine pretrial discovery. We decline to adopt this novel view, in no small part because it is squarely contrary to R.C.M. 701(f).[20]

Due to the general nature of the Defense's discovery requests, relief would only be appropriate upon Appellant's demonstration of: (1) wrongful nondisclosure, and (2) a reasonable probability of a different trial result, had the evidence been disclosed. Thus, the next question we address is whether the evidence Appellant cites was improperly withheld. In that sense, evidence required to be disclosed is that which was obviously of substantial value to the defense—either exculpatory or impeaching—or material to the defense's preparation.

Overshadowing our analysis is the method of trial preparation utilized by the parties in this case. Trial counsel and trial defense counsel did not inter-

---

[19] We have reached this conclusion when we have reviewed similar discovery request provisions in other cases. *See, e.g.*, *United States v. Major*, No. ACM 36304, 2007 CCA LEXIS 264, at *22 (A.F. Ct. Crim. App. 8 Jun. 2007) (unpub. op.).

[20] *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 512–13 (1947) (finding no legitimate purpose for ordering production of interview notes created by attorney, as the "general policy against invading the privacy of an attorney's course of preparation" is "well recognized" and "essential"); *United States v. Vanderwier*, 25 M.J. 263, 269 (C.M.A. 1987) (absent showing of necessity, military discovery rules are not so broad as to require trial counsel to turn over interview notes when "work-product privilege" not waived); *United States v. Barnes*, No. ACM 38720, 2016 CCA LEXIS 267, at *25 (A.F. Ct. Crim. App. 27 Apr. 2016) (unpub. op.) (upholding military judge's denial of motion to compel production of government paralegal's witness interview notes).

view LE until the day before trial, which meant she was interviewed about events that occurred more than a year prior and nearly a year after she had participated in two law enforcement interviews, one of which only cursorily addressed her sexual assault allegation. What should have not been a surprise to anyone involved was that LE's separate interviews with counsel for both parties revealed new information and divergent details from the interviews from the previous year, and such goes a long way to explaining the origins of Appellant's complaint. Nonetheless, the timing of trial preparation does not excuse trial counsel from fulfilling discovery obligations.

Having carefully considered all matters in the record, we are not convinced trial counsel's nondisclosure of the first six statements Appellant specifies in his appeal was improper. The fact that Appellant complained about LE not wanting to engage in a particular sex act on past occasions—when such sex act was entirely unrelated to the charged offense and was not engaged in, requested, or attempted the day of the assault—had no obvious value to the Defense. The same is true of LE's statement that Appellant had "become rougher." LE had not discussed the particular sex act in her interviews with law enforcement, nor was she asked about either the act specifically or the nature of her sexual conduct with Appellant in general. Nothing in her interviews contradicted her statement that Appellant complained of her lack of interest in this act or that Appellant had become rougher. We do not perceive any way that this information was exculpatory, useful for impeachment, or material to the Defense's trial preparation, and we find no fault in trial counsel not specifically disclosing it. We reach the same conclusion regarding LE's assertion that Appellant was "picky" about how LE initiated sexual conduct with him. During her interviews with both Security Forces and AFOSI, LE maintained she and Appellant had been fighting the day of the assault. During the interview with trial counsel, LE explained that the fight had originated out of Appellant's unhappiness with her not being as enthusiastic about sex as he wanted her to be. Because her prior interviews did not delve into the genesis of the fight or what the fight was about, the information was not exculpatory or useful for impeachment, nor did it have any obvious material value to the Defense's trial preparation. In any event, LE disclosed this same information to trial defense counsel the same day she disclosed it to trial counsel, and the information was discussed the next day during the hearing on the Defense's motions. Trial defense counsel neither objected to the information being used at trial nor requested any additional time to investigate the matter, both of which undercuts Appellant's assertion on appeal this information was material to the preparation of his defense.

LE's statement to trial counsel that Appellant had his leg between her legs at some point during the assault was not a new fact that would warrant disclosure, as LE said in both of her interviews with law enforcement that

she had attempted to keep her legs together and that Appellant was able to overpower her and then penetrate her vagina with his penis. That Appellant's leg was between her legs at some point during the assault is a seemingly obvious extension of that description and was not inconsistent with her prior statements, rendering the fact neither exculpatory nor material to the preparation of the defense and therefore not improperly undisclosed. The same is true of LE's opinion that Appellant should have heard her saying no, which was also fairly, if not necessarily, included in earlier statements that she told Appellant she did not "want this" during the assault. Importantly, LE did not tell either trial counsel or investigators that she thought or suspected Appellant did not hear her, rendering the statement's impeachment value nonexistent. Likewise, the full name and contact information for the woman LE told her parents she had been living with had no apparent relevance to the Defense's preparation or the case itself—the only significance was that LE had lied to her parents, a fact exploited by trial defense counsel during LE's cross-examination and during closing argument. Trial defense counsel did not ask for this information and trial counsel did not wrongfully withhold it.

Trial counsel's failure to disclose LE's statements regarding Appellant wearing sweatpants and then changing into shorts, as well as that she said "ow, stop, that hurts" during the assault, are more problematic. Here, trial counsel knew of statements which seemingly diverged from what LE told AFOSI. One plausible interpretation of what LE said in her AFOSI interview about Appellant's clothing is that Appellant took his shorts off prior to getting into bed.[21] She did not tell the AFOSI agents that Appellant had changed into shorts. In his closing argument, however, trial counsel said—without objection from the Defense—LE "heard his sweats hit the floor before he put his shorts on," a description which was not in evidence and was apparently drawn from his interview with LE immediately before trial. The statement "ow, stop, that hurts" was not mentioned at trial. Neither statement was exculpatory; however, they do present instances where LE's version of events shifted. This was not a case of LE elaborating on matters only briefly discussed in her AFOSI interview; instead, these two statements were at

---

[21] During this portion of the AFOSI interview—which was included in Prosecution Exhibit 3 and played for the members—LE talked about how she heard Appellant's "pants" come off before he got into bed. It is not entirely clear whether she was conflating "pants" with "shorts," that is, whether she was saying Appellant took his shorts off before getting into bed or if she was saying Appellant took off his pants and got into bed with his shorts on.

odds with what she said during the interview. Much as trial counsel noted the difference in Appellant's hand placements and LE's bodily position at the end of the assault, trial counsel should have noticed the changes regarding what Appellant was wearing and what LE claimed she said during the assault. This would have provided trial defense counsel the opportunity to confront LE with the shifts in her account in an effort to impeach her. Considering that the Government's case hinged on LE's credibility, trial counsel should have disclosed these two statements even in the absence of a specific discovery request.

Finally, trial counsel's failure to disclose LE's assertion that she confronted Appellant the next morning was improper. There can be no serious argument that her revelation of the confrontation was at odds with her statement to AFOSI that she had not talked to Appellant about the incident. Moreover, because the confrontation included a statement by Appellant, disclosure of that statement was also required under Mil. R. Evid. 304(d).

Having found error, we must determine whether relief is warranted, and we determine it is not based on the absence of a reasonable probability of a different trial result had the evidence been turned over. Before trial began, the Defense was aware of the morning-after confrontation, as LE told trial defense counsel about it the same day she told trial counsel about it. Therefore, there is no probability of a different trial result. While we do not excuse trial counsel's failure to disclose the information, we also do not perceive any reasonable impact on the trial at all.

Neither the statement about the sweatpants nor the "ow, stop, that hurts" statement was elicited at trial. Therefore, trial defense counsel's primary utility of these statements would have been to ask LE if she had made the statements to trial counsel during their interview. Trial defense counsel extensively challenged LE on differences between her original statements to Security Forces and AFOSI and her in-court testimony, to include permutations of what she said she told Appellant during the assault. As we discuss above, however, LE was consistent with respect to the material aspects of her assault allegation, and the shifts in the surrounding details of the events did not serve to undermine the allegation or create a reasonable doubt the assault occurred. Trial defense counsel's ability to add these two statements to his arsenal of attacks on LE's credibility would not have shifted the landscape of Appellant's trial in any meaningful way, and the improper disclosure therefore fails to amount to a reasonable probability of a different result.

### G. Ineffective Assistance of Counsel

On appeal, Appellant alleges his trial defense counsel team was ineffective. Specifically, he alleges trial defense counsel failed to object to the follow-

ing aspects of trial counsel's closing argument: (1) his "monster, liar, and a terrible human being" statement; (2) his vouching for evidence; and (3) his suggestion of "victim-blaming." Further, Appellant asserts trial defense counsel were ineffective in failing to seek a longer recess to review trial counsel's notes from LE's interview during the post-trial motion hearing, time which could have been used to identify additional support for the motion for a new trial.

### 1. Additional Background

Upon receiving Appellant's assignments of error and pursuant to a government request, we ordered trial defense counsel to provide declarations in response to Appellant's allegations. Appellant's lead trial defense counsel, Major (Maj) CS, was responsible for both the closing argument and the post-trial motion practice. Maj CS objected three times during trial counsel's closing argument, and each objection was sustained. He wrote in his declaration he did not object to portions of trial counsel's argument which amounted to "unpersuasive rhetoric," because he felt he could persuasively rebut those elements during the Defense's closing argument. Maj CS further explained trial counsel's argument about LE testifying to discrete details of the assault "played into the [Defense's] theory of the case," since those discrete details were absent from LE's prior statements. Regarding the receipt of trial counsel's interview notes, Maj CS related he used the approximately ten-minute recess to review the notes and he did not need additional time, because the notes were generally duplicative of the paralegal's notes from the same interview and did not offer anything "substantively new."

### 2. Law

We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In order for Appellant to prevail on a claim of ineffective assistance of counsel, he must demonstrate that counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We employ a presumption of competence, and we apply a three-part test in assessing whether that presumption has been overcome: (1) "is there a reasonable explanation for counsel's actions?;" (2) "did defense counsel's level of advocacy fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?;" and (3) "if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result?" *Gooch*, 69 M.J. at 362 (omission and alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

### 3. Analysis

As explained above, we do not find trial counsel's "monster, liar, and a terrible human being" statement or reference to "victim blaming" to be plain error. Even if trial defense counsel had objected and been overruled, we would not find an abuse of discretion on the military judge's part for the same reasons we do not find plain error. A sustained objection might have resulted in a curative instruction telling the members to disregard trial counsel's statement. Considering the scope of trial counsel's argument and the fact these comments were minor components of it, we do not think an instruction by the military judge to disregard the comments—assuming the military judge would have sustained the objections and given such an instruction— would have resulted in a different trial outcome. Understanding this, a reasonable attorney might have elected not to object to the references in order to avoid calling attention to them based on an assessment that they were buried in a complex argument. We decline to second-guess trial defense counsel's decision not to object and to instead focus on attacking the facts of the case, and we conclude his performance did not fall measurably below that which is expected of attorneys. *See United States v. Morgan*, 37 M.J. 407, 410 (C.A.A.F. 1993). Even if we were to assume *arguendo* his counsel was ineffective on these points, we do not see a reasonable probability of a different result at Appellant's trial in the absence of such errors. *See Gooch*, 69 M.J. at 362 (citation omitted).

We do find plain error for three instances of trial counsel vouching for the evidence, but we conclude those errors did not prejudice Appellant. Maj CS has explained he did not object more frequently, because he planned a fact-intensive attack on LE's testimony in contrast to what he perceived to be "unpersuasive rhetoric." To be sure, trial counsel's closing argument was a multi-threaded construction of a framework for the members focusing on offering explanations for the aspects of the case the Defense sought to exploit. We are not convinced Maj CS's explanation accounts for not objecting to such flatly improper statements such as telling the members trial counsel "knew" none of the members would immediately acquit Appellant. In the face of our conclusion Appellant was not prejudiced by the few elements of improper argument, we need not definitively determine whether or not trial defense counsel were ineffective, because we have already determined that the erroneous argument did not prejudice Appellant. The argument segments Appellant now complains of were minor and largely isolated references in a much longer argument spanning a broad range of issues and concepts. Therefore, even if trial defense counsel had objected and the military judge had sustained the objections Appellant argues his counsel should have made, there is no reasonable probability there would have been a different trial result.

We are unconvinced trial defense counsel should have requested a longer recess to review trial counsel's interview notes. By the time of the post-trial hearing, trial defense counsel had already filed a comprehensive motion for appropriate relief and a detailed supplement to that motion extensively referencing matters in the government paralegal's notes. We have ourselves compared trial counsel's notes to the paralegal's notes, and we agree trial counsel's notes do not offer any substantive new information that would have required additional time to investigate. Appellant cites to several issues he alleges trial defense counsel could have explored; however, these issues were both included in the paralegal's notes and raised during the post-trial hearing. The military judge also listed the trial counsel's notes in her ruling as a matter she considered, further evidence the notes offered little or no new information. Trial defense counsel's post-trial litigation was thorough and detailed, indicating significant and competent preparation. We conclude trial defense counsel were not deficient in not requesting additional time to review the notes.

### H. Post-Trial Delay

Appellant was sentenced on 8 June 2018. The convening authority took action on 22 October 2018, 136 days later. During that time, trial defense counsel filed the motion seeking a new trial or dismissal of the sexual assault charge on 25 June 2018; the military judge ordered a post-trial Article 39(a), UCMJ, session on 9 July 2018, and that hearing took place on 14 August 2018. The military judge issued her ruling denying the Defense's motion on 23 September 2018. Appellant's case was initially docketed with this court on 1 November 2018, 39 days later.

Appellant filed his initial assignments of error 397 days later on 3 December 2019 after requesting and receiving 11 enlargements of time over the Government's objection. One week later, the Government moved this court to compel declarations from trial defense counsel based upon Appellant's allegations of ineffective assistance of counsel and requested an enlargement of time of 14 days after the deadline we set for the declarations. We granted that motion the following day over defense objection. The Government filed its answer on 24 January 2020, 55 days after Appellant filed his assignments of error. Appellant submitted a reply brief, after seeking and obtaining three more enlargements of time, 31 days later, on 24 February 2020.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days

of sentencing, and when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

This case exceeded the 120-day standard between sentencing and action by 16 days, as well as the 18-month standard between docketing and appellate decision by just over two months. With respect to the time between sentencing and action, Appellant's post-trial motion required reconvening the court-martial to consider the issues raised and resulted in a comprehensive written ruling from the military judge. By the time the military judge had rendered this ruling, 107 days had passed since the sentence was announced. The time required for the post-trial litigation fairly explains why action was not taken within the ordinary 120-standard.

With respect to exceeding the 18-month standard for producing this opinion, there are several factors explaining that delay. We first note the record of trial is substantial, including over 750 pages of transcript, 55 appellate exhibits, and 2 video recordings. Second, Appellant took well over a year to file his assignments of error after requesting 11 extensions. Third, Appellant asserted nine errors, several of which consisted of multiple alleged sub-errors, and several of which presented complex issues of law and fact. The careful consideration of these issues has resulted in a lengthy opinion from the court. Fourth, once he did file assignments of error, Appellant alleged his trial defense counsel were ineffective, resulting in our order that they provide declarations responding to Appellant's allegations. In the face of these issues, we do not find egregious delay here, especially in light of the fact the overwhelming bulk of the delay was at Appellant's behest.

Where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Appellant has not alleged, much less demonstrated, any oppressive incarcer-

ation in the face of his appeal not resulting in a reduction in his sentence. Because our opinion does not result in a rehearing, Appellant's ability to prepare for such a hearing has not been impacted. *See id.* at 140. With respect to anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has not alleged any particularized anxiety or concern, and we do not discern such from our review of Appellant's case. Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. On the whole, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *Id.*

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court